Reed W. Easton, Esq.
Reed W Easton, P.C.
ATTORNEYS AT LAW
34A Route 645
Sandyston, NJ 07826
Tel 908.397.9367
Fax 973.250.0056
reedeaston@earthlink.net
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

DR. REED W. EASTON

*Plaintiff,*

-against-

SETON HALL UNIVERSITY,
CARDINAL JOSEPH W. TOBIN, in his
official capacity as president of the Board
of Trustees, PRESIDENT JOSEPH E.
NYRE, in his official capacity,
PROVOST KATIA PASSERINI, in her
official capacity, DR. MICHAEL
SILVESTRO, in his official capacity as
Associate Vice President Department of
Human Resources, DEAN JOYCE A.
STRAWSER, in her official capacity as
Dean of Stillman School of Business.

*Defendants*

**VERIFIED COMPLAINT
JURY TRIAL DEMANDED**

Plaintiff, Dr. Reed W. Easton for his Complaint against Seton Hall University, Cardinal Joseph W. Tobin, President Joseph E. Nyre, Provost Katia Passerini, Dr. Michael Silvestro, and Dean Joyce A. Strawser (collectively, "Seton Hall University" or "University" or "Defendants" or "Defendant") seeks a declaration that Seton Hall University's COVID-19 policy is unlawful and unconstitutional.

## JURISDICTION AND VENUE

1. This case arises under federal law, namely the Fourteenth Amendment of the United States Constitution and 42 U.S.C § 1983, the Civil Rights Act of 1964 Pub.L. 88–352, 78 Stat. 241, specifically Title VI, 42 U.S.C. § 2000e et seq. and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101et seq., and, it also arises under Article 1 of the Constitution of the State of New Jersey, and 18A:61D-1, *et seq.*

2. This Court has federal question jurisdiction over the subject matter of this case, pursuant to 28 U.S.C. §1331, 1343, and has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).

3. This Court has authority to grant declaratory relief pursuant to the federal Declaratory Judgments Act, 28 U.S.C. § 2201 and 2202, and appropriate injunctive relief. This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

4. Venue is proper in this district under 28 U.S.C. §1391(b), because Defendants reside or operate in this District, the Defendant entity, Seton Hall University and its President, who developed, approved and are responsible for the policy at issue are located in South Orange, New Jersey, and a substantial part of the events giving rise to the claims set forth in this Complaint for Declaratory Relief, Injunctive Relief and Damages arose in this District.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

## PARTIES

**Plaintiff**

6. Plaintiff was 71 years old with a demonstrated passion for teaching during a substantial part of the events giving rise to the claims set forth. Plaintiff began working for Seton Hall University in September of 1988 as a member of the full time teaching faculty.  Plaintiff was a tenured faculty member of Seton Hall University for over 33 years. He has documented comorbidities and is a devout Catholic. Plaintiff, his father and son have attended Seton Hall University. He has taught for many years eight courses per year. Four of those courses have been in person and four remote. A discrimination complaint is proposed in response to Plaintiff's claim of disability under the

Americans with Disabilities Act (ADA) for reasonable accommodation being denied without explanation even though it was previously approved for Fall 2020 and Spring 2021 semesters. Plaintiff taught remotely for Summer 2021. In addition, his documented religious objection to mandatory vaccination was denied in violation of Title VII of the Civil Rights Act of 1964 based on the sole opinion of the Archdiocese of Newark which controls Seton Hall University. Plaintiff had requested to teach the Fall 2021 semester remotely and thereafter until the pandemic is concluded without being subject to mandatory vaccination.

As a result, Plaintiff exercises his right to informed consent and to refuse unwanted medical treatment, namely COVID-19 immunization, as it is his right to do under the Fourteenth Amendment and Article 1 of the New Jersey Constitution. He resides in Sandyston, New Jersey.

**Defendants**

7. Defendant Seton Hall University is a private, Catholic university. Seton Hall University confers undergraduate, graduate, and postgraduate degrees. The university, legally incorporated as "Seton Hall University, an educational corporation of New Jersey", is governed by a 16-member board of trustees.

Upon information and belief, Seton Hall University receives funding from the federal government and the State of New Jersey. The main campus is located in South Orange, New Jersey.

8. Defendant Cardinal Joseph W. Tobin in his position as Archbishop of Newark leads the Archdiocese of Newark and is president of the Board of Trustees which is composed of sixteen members. Eleven members of the Board of Trustees serve by virtue of their positions with the university or Archdiocese of Newark. As president of the board, Cardinal Joseph W. Tobin retains the power to appoint the remaining five members of the body. The Board of  Trustees exclusively maintains the property rights of the university and provides selection of title, scope, and location of the schools and colleges of the university. The governance of the university includes a Board of Regents, which is charged with the management of the university. The Board of Regents has a membership of between 25 and 39 members. The Board of Trustees maintains the right to elect up to thirty. The Board of Regents maintain the exclusive hiring authority over the president of the university. [1] Upon information and belief, the Board of Regents approved

[1]See _"University By-Laws"_ (PDF). Office of Board Affairs. 2006. Archived   from the original (PDF) on 2008-02-29. Retrieved 2008-01-06. https://web.archive.org/web/20080229070420/http://www.shu.edu/offices/president/upload/University-By-Laws.pdf

Seton Hall University's COVID-19 Immunization Policy at issue in this case without adequate consideration of the matters set forth in this Complaint. Upon information and belief, the Board of Regents were motivated to order this mandate by Seton Hall University due to the control of the Board of Regents by the Archdiocese of Newark and the Board of Trustees. This proves to be a conflict of interest and a glaring bias by the Cardinal. His office is located in Newark, New Jersey.

9. Defendant Joseph E. Nyre is President of Seton Hall University. He is ultimately responsible for enforcing Seton Hall University's COVID-19 Immunization Policy. His office is located in South Orange, New Jersey.

10. Defendant Katia Passerini is Provost of Seton Hall University. She is ultimately responsible for enforcing Seton Hall University's COVID-19 Immunization Policy. Her office is located in South Orange, New Jersey.

11. Defendant Michael Silvestro is the Associate Vice President in charge of the Department of Human Resources . He is ultimately responsible for enforcing Seton Hall University's COVID-19 Immunization Policy. His office is located in South Orange, New Jersey.

12. Defendant Joyce A. Strawser is the Dean of the Stillman School of Business of Seton Hall University. She is ultimately responsible for enforcing Seton Hall University's COVID-19 Immunization Policy. Her

office is located in South Orange, New Jersey.

13.  Defendants' actions, and the vaccination mandate referenced herein, constitute state action taken under color of law.

### FACTUAL BASIS FOR CLAIMS

14. Upon information and belief, at all times relevant herein, Defendant Seton Hall University is a nonprofit corporation doing business in South Orange, New Jersey.

15. At all times relevant to this lawsuit, the Plaintiff has resided in Sandyston, Sussex County, New Jersey, and therefore venue is properly placed in the District of New Jersey.

16. Plaintiff was hired in September 1988 and worked as a full time faculty member for Defendant for over 33 years.

17. On May 14, 2021, the Executive Cabinet required every member of the Seton Hall community to be fully vaccinated prior to the start of the Fall 2021 semester, subject to exemptions for religious beliefs, pre-existing health conditions, or personal reasons while COVID-19 vaccines are authorized on an emergency-use basis.

18. On May 17, 2021, Plaintiff contacted Defendant, Michael Silvestro, of the HR Department including a detailed statement of why Plaintiff should be

allowed to continue to perform his current faculty position remotely based on the authority of the Americans with Disabilities Act (ADA) coupled with Title VII of the Civil Rights Act of 1964 as interpreted by the U.S. Equal Employment Opportunity Commission (E.E.O.C) and as ultimately decided by the U.S. Supreme Court in E.E.O.C. v. Abercrombie & Fitch Stores 135 S. Ct. 2028 (2015).

19. On July 8, 2021, Plaintiff submitted a Reasonable Accommodation Form.

20. On July 22, 2021, Plaintiff forwarded in response to the request from HR:

1. Updated Healthcare Provider Certification

2. Updated Accommodation Release

21. On August 5, 2021, the Health Intervention and Communication Team for the University referred to a Confidential Vaccine Declaration (CVD) first announced on May 14, 2021 as required for official attestation of vaccination status. All members of the University community were instructed to carry their vaccination cards and/or take a picture of it with their mobile phones. Students were instructed to upload their vaccination cards on the student Health Portal.

22. On August 9, 2021 and three weeks before the start of the Fall 2021 semester Plaintiff requested a timely response.

23. On August 26, 2021, Seton Hall University declared that individuals

declaring an exemption for personal reasons will be expected to achieve full

vaccination status within 40 days after any vaccine's full approval by the

FDA.

24. On Sunday, August 29, 2021 at 9:24 PM the day before the Fall 2021

classes were to begin Defendant, Dr. Michael Silvestro, of the HR

Department finally responded to Plaintiff with a one line order without

further explanation.

"Based on the information provided by your healthcare provider, your

requested accommodation is not approved."

HR at Seton Hall University went on to conclude:

"As you know, the University has determined that in-person teaching is an

important step toward re-engaging students in a vibrant Seton Hall

community and in the best interests of the students.  Therefore, consistent

with our educational mission and for the reasons set forth above, your

requested accommodation to teach remotely is not approved.

However, so that you have sufficient time to become fully vaccinated, the

University will allow you to teach remote synchronous for the next six (6)

weeks, at which point you are to return to the classroom, fully

vaccinated.  Upon your return, the University can provide you with a face

shield and Plexiglas at your lectern.  Please let me know if you would like

assistance in making those arrangements."

 "In connection with your request for an exemption from the University's

vaccine requirement based on your religious beliefs, the University sought

guidance from the Archdiocese of Newark.  We have been advised by the

Vicar General that based on pronouncements by Pope Francis and the United

States Conference of Catholic Bishops, priests of the Archdiocese have been

notified that it is not possible for a Catholic to claim an exemption from

vaccination on religious grounds and that they should not support a religious

exemption for those entrusted to their pastoral care. "

25. On September 13, 2021, Plaintiff filed with Equal Employment Opportunity

Commission ("EEOC"). The EEOC terminated their investigation at the

request of Plaintiff and granted the Right to Sue on June 1, 2023. This

Complaint was filed within 90 days of June 1, 2023 as required.

26. For the balance of the Fall 2021 semester Plaintiff continued to teach on a

remote basis.

27. On September 21, 2021, after being informed that he was scheduled for

Spring 2022 two graduate courses remotely and one graduate course in

person, Plaintiff asked the Chairperson of his Department that the in person

graduate class be converted to online.

28. On September 22, 2021, the Chairperson responded that conversion to online was not possible.

29. On October 29, 2021, Defendant, Dean Joyce A. Strawser, contacted the Plaintiff. The Defendant, Dean Joyce A. Strawser reminded Plaintiff that he was to teach remotely for a six-week period, after which he was required to return to the classroom, fully vaccinated and that Plaintiff was well beyond the six week period.

30. On November 1, 2021, Plaintiff responded to Defendant, Dean Joyce A. Strawser, explaining that although his position had been legally documented and presented, to Defendant, Dr. Michael Silvestro, Plaintiff had been waiting since May 17, 2021 for an assessment of and explanation of the request of Plaintiff for accommodation. Further, that the procedures provided for reviewing such requests internally were not followed. Under the provided "Policy on Reasonable Accommodations for Employees with Disabilities" the determination was to involve an interactive process involving the employee, his/her supervisor, and the AVP for HR. Plaintiff was never contacted to participate in any interactive process. Defendant , Dr. Michael Silvestro, simply issued a command that Plaintiff teach remotely synchronously for a six week period after which Plaintiff was to return to the classroom fully vaccinated.

31. On November 10, 2021, Defendant, Dr. Michael Silvestro, who was referred Plaintiff's email of November 1, 2021, responded that he had consulted with Defendant, Dean Joyce A. Strawser and the Archdiocese and had no further obligation. He reiterated that Plaintiff was required to return to in-person teaching fully vaccinated and as an accommodation would be offered a face shield and plexiglass at the lectern.

32. By January 1, 2022, Plaintiff realized his position was impossible. Faced with forced resignation as his only option to not submit to vaccination, Plaintiff notified, as was required, Dean Joyce A. Strawser of his intention to retire effective immediately. The retirement was premature and solely dictated by his reduced access to the University without vaccination coupled with a requirement that he teach on campus for Spring 2022 fully vaccinated. Plaintiff was concerned as to what a threatened dismissal would have on his future teaching career as well as the delay of retirement benefits while the matter was in litigation.

33. On January 17, 2022, Plaintiff received his annual review for the 2020-21 Academic Year signed by Defendant, Dean Joyce A. Strawser. It congratulated Plaintiff on his publication in *Estate Planning*, which the Washington and Lee Law School ranking service ranked first of two journals dedicated to estate planning. It further commended Plaintiff for his

outstanding teaching performance.

## BACKGROUND TO CLAIMS

*COVID-19*

34.  On January 20, 2020, in the State of Washington, a 35-year old man who returned from Wuhan, China was confirmed as the first known case of COVID-19 in the United States.

35. On January 29, 2020, the White House Coronavirus Task Force was established to oversee and coordinate the Trump Administration's response to COVID-19; Alex M. Azar, II, Secretary of Health and Human Services ("HHS") was appointed Chair and Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, was appointed as a member.

36. On January 31, 2020, as a result of confirmed cases of COVID-19, Secretary Azar determined that a public health emergency existed as of January 27, 2020,  pursuant to §319 of the Public Health Service Act, 42 U.S.C. § 247d *et seq.*

37. HHS oversaw the public health response with the Centers for Disease Control and Prevention ("CDC") acting as the lead first responder, tracking cases, developing tests, deploying personnel, providing guidance to state and local health departments, and recommending best practices to the public.

38. The National Institutes of Health ("NIH"), the nation's medical research

agency within HHS, worked on the development of a coronavirus vaccine.

39. On February 26, 2020, Vice President Mike Pence replaced Secretary Azar as Chair of the White House Coronavirus Task Force and Deborah Birx, United States Global AIDS Coordinator, became White House Coronavirus Response Coordinator on the Task Force.

40. On March 9, 2020, Governor Philip D. Murphy issued Executive Order No. 103 declaring a public health emergency and state of emergency in New Jersey as a result of the growing numbers of COVID-19 cases in the state. Governor Murphy authorized and empowered the State Director of Emergency Management, in conjunction with the Commissioner of the Department of Health, to take emergency measures to protect the public from the possible exposure of COVID-19.

41. On March 11, 2020, the World Health Organization made the assessment that COVID-19 could be characterized as a pandemic.

42. In New Jersey, the number of cases of COVID-19 throughout the course of 2020 (when no vaccines existed) compared with the number of cases of COVID-19 throughout the course of 2021 (when EUA COVID-19 vaccines were in use) are not materially different.

43. On June 4, 2021, Governor Philip D. Murphy signed Assembly Bill No. 5820 into law as law P.L. 2021, c. 103 and issued Executive Order No. 244 ending

the COVID-19 Public Health Emergency Order N. 103 (2020) in New Jersey as a result of the reduced morbidity and mortality of COVID-19 in New Jersey.

44. On August 23, 2021, the U.S. Food and Drug Administration approved the first COVID-19 vaccine. The vaccine had been known as the Pfizer-BioNTech COVID-19 Vaccine, and is now marketed as "Comirnaty" for the prevention of COVID-19 disease.

45. On August 23, 2021, Governor Philip D. Murphy signed Executive Order No. 253 that provided that as of October 18, 2021, employees at public colleges and universities are required to complete a full vaccination course or undergo regular testing at a minimum of once to twice each week. However, any collection must comport with all federal and state laws, including but not limited to both the New Jersey Law Against Discrimination and the Federal Title VII of the Civil Rights Act of 1964 which expressly prohibit employers from discriminating against employees because of their religious practices or disabilities if they can be reasonably accommodated.

46. On September 9, 2021, President Biden announced the Path Out of the Pandemic: COVID-19 Action Plan. As part of that plan, the President signed Executive Order 14042, Ensuring Adequate COVID Safety

Protocols for Federal Contractors. Federal Contractors and subcontractors were required to receive COVID-19 vaccination except in limited circumstances where an employee is legally entitled to an accommodation.

47. On November 5, 2021, U.S. Occupational Safety and Health Administration (OSHA) issued an emergency temporary standard (ETS) that covers private-sector companies with 100 employees or more, a shot requirement for health-care companies paid by Medicare or Medicaid, and one for federal workers.  It requires all employers with 100 or more employees to mandate vaccinations. For any workers not vaccinated, they must produce a negative test result at least weekly before coming to work. The deadline was January 4, 2022.  86 Fed. Reg. 61402

48. On December 7, 2021, the Biden Executive Order 14042 vaccine mandate was blocked nationwide. The U.S. District Court of the Southern District of Georgia found that the states could likely prove that Congress did not clearly authorize the president to issue the mandate, and that it "goes far beyond addressing administrative and management issues in order to promote efficiency and economy in procurement and contracting." The court said "Thus, on the unique facts before it, the court finds it necessary, in order to truly afford injunctive relief to the parties before it, to issue an injunction with nationwide applicability." *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D.

Ga. 2021). In August 2022, the U.S. Court of Appeals for the Eleventh

Circuit held that the injunction should be narrowed to specific states—

Alabama, Georgia, Idaho, Kansas, South Carolina, Utah, and West

Virginia—to a specific industry group—federal contracts and subcontracts

with members of the Associated Builders and Contractors—and in the

narrow situation when deciding whether to grant a contract to those specific

members or to other contract bidders. *Georgia v. President* of the U.S., 46

F.4th 1283 (11th Cir. 2022).

49. On January 13, 2022, in *National Federation of Independent Business v*

*Department of Labor*, the US Supreme Court blocked the Occupational

Safety and Health Administration (OSHA) emergency temporary standard

(ETS) requiring vaccination, subject to religious or disability

accommodations, or weekly testing and masking in businesses with 100 or

more employees. *National Federation of Independent Business v*

*Department of Labor, Occupational Safety and Health Administration*, 1595

US __, No. 21A244 (January 13, 2022).

50. On March 4, 2022, Governor Philip D. Murphy signed Executive Order No.

292 stating Executive Order 253 remain in effect but lifted the requirement

that face masks be worn in school districts while continuing to require

workers in school districts to receive a COVID-19 vaccine or undergo

regular testing.

51. On August 15, 2022, Governor Philip D. Murphy signed Executive Order No. 302 wherein the State would immediately no longer require that unvaccinated workers in school districts undergo routine COVID-19 testing requirements. Further, as of September 1, 2022, unvaccinated state employees and state contractors would no longer be required to undergo routine COVID-19 testing.

52. On January 30, 2023, the Executive Office of the President issued a Statement of Administration Policy announcing that the COVID emergency would end on May 11, 2023.

53. On March 23, 2023, the U.S. Court of Appeals for the Fifth Circuit in New Orleans ruled in an en banc hearing to keep a preliminary injunction on the COVID-19 vaccine mandate for federal workers in place nationwide. Case: 22-40043

54. On April 10, 2023, President Biden signed a Joint Resolution (H.J. Res. 7) ending the COVID national emergency that was set to end on May 11, 2023.

55. Although the State requirements did not impact an employer's ability to impose more stringent vaccination or testing requirements on workers, including, for example, requiring all CDC-recommended booster doses, any requirement for more frequent testing, for testing of both vaccinated and

unvaccinated staff, and for mandatory vaccinations without a testing alternative, such requirements must comport with all federal and state laws, including but not limited to both the New Jersey Law Against Discrimination and the Federal Title VII of the Civil Rights Act of 1964 which expressly prohibit employers from discriminating against employees because of their religious practices or disabilities if they can be reasonably accommodated.

<u>**COUNT ONE**</u>
<u>**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**</u>
<u>**42 U.S.C. § 2000e -** *et seq*. -</u>
<u>**DISCRIMINATION AND FAILURE TO ACCOMMODATE ON THE BASIS OF RELIGION**</u>

56. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

57. Title VII of the Civil Rights Act of 1964 bans discrimination based on an individual's race, color, religion, national origin, or gender.

58. The Catholic Church and the Congregation for the Doctrine of the Faith, the church's highest doctrinal authority, have wrestled with the moral permissibility of receiving COVID-19 vaccines because of their relation to fetal cell lines developed from abortions in the 1970s.

Although the Pope as the Apostolic See has approved the reception of the

Pfizer and Moderna vaccines,[2] this decision stops short of instructing

Catholics to take either vaccine. It recognizes that Catholics might for

reasons of conscience reject either vaccine.

The Apostolic See states:

"Those who, however, for reasons of conscience, refuse vaccines produced

with cell lines from aborted fetuses, must do their utmost to avoid, by other

prophylactic means and appropriate behavior, becoming vehicles for the

transmission of the infectious agent. In particular, they must avoid any risk

to the health of those who cannot be vaccinated for medical or other reasons,

and who are the most vulnerable."

Plaintiff objects to the vaccines because of the way that they were either

developed, researched, tested, produced or otherwise developmentally

associated with fetal cell lines that originated in elective abortions. Plaintiff

relies on the exception provided by the Apostolic See.

The Johnson & Johnson/Jansen single shot vaccine has been held morally

reprehensible and cannot be received by a Catholic in good conscience. The

Archdiocese of New Orleans has published a clear statement. [3]

[2].
https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaih
_doc_20201221_nota-vaccini-anticovid_en.html.
[3] https://nolacatholic.org/news/a-statement-regarding-the-janssen-
johnson-johnson-covid-19-vaccine

59. Abortion rightfully influences certain Catholic bishops if not the

Archdiocese of Newark. Not all Catholic bishops agree that there is no

Catholic exemption to getting Covid vaccinations. Pro-life U.S. prelates are

not loudly endorsing their use. Policies vary from diocese to diocese and

prelate to prelate.

On August 5, 2021, bishops in Colorado offered a template of a letter [4] for

Catholics seeking exemption from any vaccination mandate. The letter in

part states "a Catholic may judge it wrong to receive certain vaccines for a

variety of reasons … and there is no authoritative Church teaching

universally obliging Catholics to receive any vaccine. An individual

Catholic may invoke Church teaching to refuse a vaccine that used abortion-

derived cell lines at any stage of the creation of the vaccine."

"Furthermore, the free-exercise clause of the U.S. Constitution's First

Amendment requires state accommodation of individuals who object to

vaccinations on religious grounds."

The letter concludes "Vaccination is not a universal obligation and a person

must obey his or her own conscience. Therefore, if a Catholic comes to an

informed judgment that he or she should not receive a vaccine, then the

[4]. https://cocatholicconference.org/template-for-religious-exemption-from-covid-19-vaccines/

Catholic Church requires that the person follow this judgment of conscience and refuse the vaccine. The Catechism is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters." [5]

On October 13, 2021, Archbishop Timothy Broglio, head of the Archdiocese for the Military Services, USA agreed in a statement released to the troops.[6] "No one should be forced to receive a COVID-19 vaccine if it would violate the sanctity of his or her conscience." While the Pope has deemed COVID-19 vaccines to be not sinful, Broglio emphasized the "sanctity of conscience." If the vaccine violates the sanctity of an individual's conscience, they should not be forced to receive the vaccine. "The denial of religious accommodations, or punitive or adverse personnel actions taken against those who raise earnest, conscience-based objections, would be contrary to federal law and morally reprehensible," said Broglio, in his

[5] https://catholic-factchecking.com/2021/07/vaccine-exemption-resource-for-individuals
[6] https://www.catholicnewsagency.com/news/249271/archbishop-broglio-covid-19-vaccines-morally-permissible-but-troops-may-conscientiously-object

letter. Those who refuse the COVID-19 vaccine must "continue to act in charity for their neighbors and the common good" by wearing masks, social distancing, and testing routinely, Broglio's letter closes. And once a treatment becomes available that is "not derived from, or tested with abortion-derived cell lines," he said, troops should remain open to receiving it.

60. In what only can be interpreted as hypocritical, Seton Hall University turned to the Archdiocese of Newark and effectively its own Board of Trustees at Seton Hall University to confirm or reject Plaintiff's religious objection to mandatory vaccination.  At that time Seton Hall University attempted to confirm what is and define what should be Plaintiff's religious belief as a Catholic. Giving due respect to the opinion of the Vicar General of the Archdiocese of Newark, consideration needs to be given to Plaintiff holding a sincere religious observance and practice, as well as, belief different from the opinion expressed by the Archdiocese of Newark based on his understanding of his religion's requirements. The business model/relationship between Seton Hall University and Archdiocese of Newark strongly suggests that the Archdiocese of Newark should have excused itself from input concerning such cases. The argument can be made that it was prejudicial and vested in its interpretation.

61. While Seton Hall University technically offers an exemption for a religious objection, in light of its absolute statement that it is not possible for a Catholic to claim an exemption from vaccination on religious grounds it is effectively not offering a religious objection for Catholics.

62. Moreover, Congress defined "religion," for Title VII's purposes, as "includ[ing] all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Thus, religious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated.

The word "religion" is defined to "includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to" a "religious observance or practice without undue hardship on the conduct of the employer's business." § 2000e(j).

Defendant has never expressed, negotiated, argued nor proven anything. It has been mute and unresponsive as to any alternatives not involving full vaccination including but not limited to the possibility of in-person instruction without vaccination subject to regular testing or permitting Plaintiff's teaching of graduate courses which are customarily remote for which Plaintiff has substantial experience. Any of these possible alternatives

could not be interpreted as causing undue hardship to the Defendant. Defendant erred in its actions against Plaintiff with no showing of probable cause forcing Plaintiff to retire to not submit to vaccination.

63. On May 28, 2021, the U.S. Equal Employment Opportunity Commission (EEOC) updated its guidance on employer vaccination policies in the form of additional Q&As. Some of the Q&As relating to mandatory vaccination policies, accommodation, and confidentiality supplement and clarify EEOC guidance that was originally issued on these topics on December 16, 2020.

*"Exemption from a Vaccine Mandate Based on Religious Beliefs:*

An employee may request, based on a sincerely-held religious belief, to remain unvaccinated, receive only a specific brand of the COVID-19 vaccine, or wait for an alternative version of the vaccine to become available. Employers should process these requests in the same manner as other accommodation requests. "Religion" is defined broadly under Title VII. According to the Guidance, employers should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance, "unless the employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance," in which case the employer could request additional supporting information.

"Undue hardship" under Title VII means "more than minimal cost or burden on the employer." It is a less stringent standard than the disability-related undue hardship standard under the ADA, with relevant factors that include the proportionate number of employees in the workplace who already are partially or fully vaccinated, and the extent of employee contact with non-employees. The Guidance suggests that before taking adverse action against an unvaccinated employee who cannot be accommodated, employers determine if obligations may arise under other laws."

64.  A letter from Fr. Philip-Michael Tangorra, Pastor, Our Lady Queen of Peace, Roman Catholic Church, Branchville, New Jersey part the Diocese of Paterson, New Jersey was provided to Seton Hall University wherein he expressly stood behind Plaintiff's concerns.

In that letter he wrote:

"Reed Easton and his wife Elise have been regular parishioners of my congregation from the very beginning of my becoming its Pastor. I have listened and discussed their concerns in regard to Right to Life many times. I have been recently advised by Reed that he has requested under the Americans with Disabilities Act (ADA) a reasonable accommodation for Fall 2021 from Seton Hall University so as to be allowed to work at home in

regard to his current faculty teaching position.  Further, his chronic medical conditions have been recently documented by his healthcare provider.

Reed has further advised me that he has raised a religious objection to the mandatory vaccination required by Seton Hall University citing Title VII of the Civil Rights Act of 1964.

Reed has my full backing in his decision to reject mandatory vaccination and I have indicated I will sign any further religious or conscientious exemption forms that he presents to me.

On August 9, 2021, I distributed an email to my flock and the following are excerpts from that email.

In recent weeks I have received numerous requests to clarify the situation of vaccinations: their morality, and the situation of possible conscientious exemptions. Furthermore, due to the rise of COVID cases in our area, I know that fears have been stoked and these fears can certainly effect people's involvement at church. I wanted to address all these concerns, and decided to do so in response to a recently received "Ask the Pastor". "

…

**To Vaccinate or Not To Vaccinate? Is There a Religious Exemption?**

Do you have an ability as a Catholic to be free from coercion to receive a COVID-19 vaccination? Absolutely! Based on the moral criteria provided

by the Congregation for the Doctrine of the Faith (CDF), a Catholic absolutely can refuse on moral grounds the forced/coerced administration of the three COVID-19 vaccinations currently available in the United States of America. While the Pfizer and Moderna vaccines are "less-evil" because the vaccines themselves are not derived from the cell line of an aborted fetus, they were tested using that cell line and that still is a violation of the dignity of that child's life lost in 1973.

…

Furthermore, the CDF in their note on the permissibility of vaccines from December 21, 2020 stated: "At the same time, practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary." Thus, there must be the freedom of each person to choose to be or not to be vaccinated. The Church does not recognize any form of mandated vaccination as valid."

65. Beyond a discussion of canon law, a sincerely held religious belief includes a moral or ethical belief against receiving a COVID-19 vaccination that has the strength of a traditional religious view. The sincerity of the belief should be judged based on the employee's words and conduct at the time the conflict about the COVID-19 vaccine arises as well be based on prior words and conduct. Employers cannot limit what a sincerely held

religious belief is to organized religion, because that would discriminate against those with sincere beliefs that are not part of an organized religion. Plaintiff's sincere belief is confirmed by Plaintiff's Pastor. In addition, over the past few years Plaintiff with his wife have identified the enormous amount of food flavorings that use fetal cells and on numerous occasions advised the former Bishop of the Diocese of Paterson the Most Reverend Arthur J. Serratelli as well as other members of the clergy.

On September 8, 2022 Plaintiff executed and delivered to Fr. Philip-Michael Tangorra, a Health Care Declaration ("Living Will") and Power of Attorney for Health Care naming Fr. Philip-Michael Tangorra as his agent. Included therein was the following declaration:

"My sincerely held religious beliefs do not allow me to receive the COVID-19 vaccine or any other vaccine that is in any way derived or tested on fetal cells. I cannot use any product that takes its origin in abortion. "For you created my innermost being. You knit me together in my mother's womb." Psalm 139:13. The innermost being is extremely sacred. I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn. God's word tells me to keep my body pure. I cannot receive a Covid-19 vaccine or any other vaccine that is any way derived or tested on fetal cells under any

circumstances."

As a matter of sincere religious practice, Plaintiff is opposed to using fetal cells in food, medicine, and vaccines.

*E.E.O.C. v. Abercrombie  & Fitch Stores* [7]  is a seminal case in the area. In that decision the question was addressed whether Title VII of the Civil Rights Act of 1964 prohibits a prospective employer from refusing to hire an applicant in order to avoid accommodating a religious practice that it could accommodate without undue hardship. A practicing Muslim who, consistent with her understanding of her religion's requirements, wearing a headscarf applied for a position in an Abercrombie store. The store manager was concerned, that headscarf would conflict with the store's "Look Policy" and refused to hire her. It was decided that an employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. Religious practice was found to include religious customs and traditions. Plaintiff is firmly against abortion for reasons of religious observance and practice, as well as belief and supports adoption agencies and social support agencies for young mothers. Without questioning the distinctions drawn among the available vaccines under canon law, for reasons of conscience and religious custom vaccines in any

[7]. 135 S.Ct. 2028 (2015)

way derived from aborted fetuses are unacceptable. The fact that certain vaccines are no longer authorized only on an emergency-use basis has no effect on Plaintiff's objection to its mandatory application.

 In *Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania* [8] the Third Circuit issued an important decision on the question of whether an employee's honestly and strongly held beliefs could be considered "religious" under Title VII of the Civil Rights Act of 1964. The Court expressly began by acknowledging that Title VII prohibits discriminating against employees because of their religious practices if they can be reasonably accommodated. Mercy instituted a rule that all employees had to receive a flu vaccination each year. Mercy allowed for religious exemptions. Fallon cited no religious source, just his belief that it is wrong to cause harm to your own body.  Mercy decided that this reason was not "religious" under its policy, and ordered Fallon to get the shot or provide a letter from clergy explaining why he could not get the vaccination for religious reasons.  He failed to provide the letter and refused to be vaccinated.  Mercy therefore fired him. Fallon filed suit in Federal District Court for the Eastern District of Pennsylvania alleging that Mercy had fired him because of his religious beliefs, and therefore committed religious

[8] 877 F.3d 487 (3d. Cir. 2017)

discrimination in violation of Title VII. The trial judge disagreed and dismissed his suit. Fallon appealed to the United States Court of Appeals for the Third Circuit. The Third Circuit agreed with the opinion of the trial judge and upheld the decision.

The Court explained that an employee must prove three things to establish that he was the victim of unlawful religious discrimination: "(1) he held a sincere religious belief that conflicted with a job requirement, (2) he informed his employer of the conflict, and (3) he was disciplined for failing to comply with the conflicting requirement.'' The only question was whether Fallon had a "sincere religious belief".

The Court explained that general political, moral or philosophical beliefs do not constitute a "religious" belief under Title VII. Relying on the United States Supreme Court's decision in *United States v. Seeger* [9], Judge Roth explained that the question is "does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" The Third Circuit adopted a test to

[9]. 380 U.S. 163 (1965)

apply this question in the case of *Africa v. Commonwealth of Pennsylvania*
[10] "First, a religion addresses fundamental and ultimate questions having to
do with deep and imponderable matters. Second, a religion is comprehensive
in nature; it consists of a belief-system as opposed to an isolated teaching.
Third, a religion often can be recognized by the presence of certain formal
and external signs."

The Court then examined Fallon's beliefs against the requirements of
the *Africa* test.  While accepting that Fallon's beliefs were genuine and
strongly held, it found that they failed all three parts of the "religion"
 test.  First, Fallon's belief did not address "ultimate questions having to do
with deep and imponderable matters."  It simply reflected Fallon's opinion
that the vaccination did more harm than good.  Second, his beliefs were not
"comprehensive in nature" or a "belief system," but rather was simply an
isolated belief about the particular vaccination.  Third, Fallon's belief had no
"formal or external signs" that indicated that these beliefs were
religious.  Having failed to demonstrate that his belief satisfied any of these
three requirements, the Court found that Fallon's beliefs were not

[10] 662 F.2d 1025 (1981)

"religious," and therefore his firing did not constitute religious discrimination in the eyes of the law.  The Third Circuit thus upheld the dismissal of his lawsuit.

The takeaway is that Courts will protect validly held religious beliefs and require employers to provide reasonable accommodations for them, provided those beliefs are actually religious.  If they are not, Title VII's religious protections will not protect the employee.

The United States Court of Appeals for the Third Circuit hears appeals from the federal district courts of New Jersey, Pennsylvania, Delaware and the United States Virgin Islands.  For these areas it is the highest federal court below the United States Supreme Court.  This particular case, arose in the United States District Court for the Eastern District of Pennsylvania, but since it was decided by the Third Circuit it is binding on New Jersey Courts interpreting Title VII. This decision applies only to Title VII, not the New Jersey Law Against Discrimination.

 It is distinguishable from Plaintiff's situation in that Mercy allowed for a religious exemption that did not exclude Catholics. Plaintiff has a religious source, an orthodox belief in God, and has exhibited formal and external signs. A letter from clergy explaining why Plaintiff could not get the vaccination for religious reasons was provided. Plaintiff meets both the tests

of the United States Supreme Court as well as the tests previously adopted by the Third Circuit.

While Defendant technically offers an exemption for religious objection, it light of its categorical statement that it is not possible for a Catholic to claim an exemption from vaccination on religious grounds it is effectively not offering a religious objection for Catholics.

In *Prager v. Joyce Honda, Inc,* [11] the New Jersey Appellate Division has held that a written warning, if part of a system of progressive discipline, may constitute an adverse employment action under the New Jersey Law Against Discrimination ("NJLAD"), which in turn could mean an employer could be held liable for discriminatory or retaliatory actions. Prior to *Prager* New Jersey courts generally found that written warnings, absent consequential discipline, did not constitute adverse employment actions. This case makes it clear that, if the warnings set forth even future mandatory progressive discipline, such warnings may be considered an adverse employment action for purposes of imposing liability under the NJLAD.

The constant statements in regard to disciplinary action with the threat of dismissal constitute the necessary disciplinary action.

Per the Faculty Guide of the University Section 3.10, a termination of a

[11] 146 A. 3d 177-2016

tenured appointment without cause is possible by a decision of the Board of Regents upon the recommendation of the Provost because of a perceived but not necessarily proven "severe, drastic, and emergency University-wide situation". The Board of Regents are elected by the Board of Trustees who serve by virtue of their positions with the Archdiocese of Newark. [12]

When an employee is forced to resign or retire, due to harassment or discrimination he or she may be deemed constructively discharged.  If proven, he or she is entitled to the same remedy as if he or she were discharged involuntarily.  This often arises when an employer makes significant and severe changes in the terms and conditions of a worker's employment.

In *Donelson v. DuPont Chambers Works*[13], the New Jersey Supreme Court stated that, a constructive discharge occurs when a company makes things "so intolerable that a reasonable person would be forced to resign rather than continue to endure it."

A 'hostile work environment' is a workplace where there are serious instances of harassment and discrimination against protected characteristics

---

[12] https://www.shu.edu/provost/upload/Faculty-Guide.pdf Section 3.10
[13] 206 N.J. 243,263 2011

such as race, color, religion, sex and pregnancy, national origin, age (40 or older), disability or genetic information.

The employer can breach its duty by failing to provide an accommodation that is reasonable or by failing to engage in a good faith interactive process to identify accommodations.[14]

In regard to the interactive process, the Third Circuit has explained that "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." [15]

An employee has no obligation to unilaterally identify and propose a reasonable accommodation[16]

"[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." [17]

Plaintiff was met only with arrogance and commands. Plaintiff's retirement was dictated by his reduced access to the University without vaccination coupled with the requirement he teach on campus.

---

[14] *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 317–18 (3d Cir. 1999).

[15] *Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 332 (3d Cir. 2003).

[16] *Taylor*, 184 F.3d at 315–17.

[17] Id. at 318.

66. Removing requests for religious objections from Catholics contrary to the very religious exception provided when the decision of the Apostolic See was made that the vaccines were morally permitted, as well as, denying the possibility of the separate existence of a sincerely held religious belief, practice, or observance violates the Constitution and Title VII, federal civil rights law that bars employment discrimination based on religion. Mandatory vaccination and in-person instruction were always linked by Defendant, not separate issues, and as such were never addressed as such by Defendant.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## COUNT TWO
## VIOLATION OF AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. § 12101 *et seq.* - DISCRIMINATION AND FAILURE TO ACCOMMODATE ON THE BASIS OF DISABILITY

67. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

68. Dr. Michael R. Dara who has been Plaintiff's physician for over thirty years on July 22, 2021 provided a certification that Plaintiff suffers from chronic respiratory impairment in the form of chronic bronchitis with chronic broncho pneumonia, high blood pressure, high cholesterol and heart irregularities due to a bundle branch block. Bundle branch block is a condition where there is a delay or blockage along the pathway that electrical impulses travel to make the heart beat that may affect heart pumping blood efficiently through the body causing syncope (fainting). Electrical impulses occur within the heart muscle.

69. The COVID 19 vaccine has been proven by the Centers for Disease Control and Prevention (CDC) [18] to have contributed to a higher than usual number of cases of heart inflammation, hypertension, tachycardia and bradycardia during a syncopal event. The CDC website states that vaccine contributes to Appendix D: Potential characteristics of allergic reactions, vasovagal reactions, and vaccine side effects following COVID-19 vaccination

[18] https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html

shortness of breath, wheezing, bronchospasm, stridor, and hypoxia. If

accompanied by anxiety, vaccine may contribute to elevated respiratory

rate.

70. Unfortunately, in New Jersey [19] as opposed to other states, the most

common prophylactics hydroxychloroquine or chloroquine may be

prescribed and dispensed for treatment of COVID-19 only if supported by a

positive test result, which must be documented on the prescription, and

limited to a 14-day supply, with no refills permitted. Note: These possible

prophylactics are thus not freely available to New Jersey residents. The

result is Plaintiff must show exposure and positive test results for COVID-

19 before these well known prophylactics might be made available in New

Jersey. As such, there is not available a recognized prophylactic for Plaintiff

as a New Jersey resident in anticipation of Plaintiff being exposed and

demonstrating positive test results to COVID-19. The State has not only

stripped freedom/rights of Plaintiff but also denied residents of the

availability of the very medicines that have demonstrably proven to

counteract the disease they say they are trying to prevent.  Thus, for the

preservation of public health, safety, and general welfare Plaintiff needs to

[19] DCA Administrative Order No. 2020-01 dated March 29, 2020.
https://www.nj.gov/oag/newsreleases20/DCA_AO_2020-01.pdf.
  Updated by DCA Administrative Order No. 2020-3 dated April 9, 2020
https://www.njconsumeraffairs.gov/Documents/DCA%20AO2020-3.pdf

teach remotely.

71. The only response by Defendant was one sentence in length without any expressed reason or justification. It came in the previously referred to email on August 29, 2021 from the Department of Human Services stating simply that "Based on the information provided by your healthcare provider, your requested accommodation is not approved. … The email went on to say However, so that you have sufficient time to become fully vaccinated, the University will allow you to teach remote synchronous for the next six (6) weeks, at which point you are to return to the classroom, fully vaccinated. Upon your return, the University can provide you with a face shield and Plexiglass at your lectern."

72. On November 1, 2021, Plaintiff informed Defendant, Dean Joyce A. Strawser, that although his position had been legally documented and presented, that the procedures provided for reviewing his requests internally were not followed. Under the provided "Policy on Reasonable Accommodations for Employees with Disabilities" the determination was to involve an interactive process involving the employee, his/her supervisor, and the AVP for HR. Plaintiff was never contacted to participate in any interactive process. On November 10, 2021, Defendant, Dr. Michael Silvestro stated that he had consulted with Defendant, Dean Joyce A.

Strawser and the Archdiocese and had no further obligation. This is false.
Section 2. Review of Requests for Reasonable Accommodation states "The
determination as to reasonable accommodation is made on a case by-case
basis through an interactive process involving the employee, the supervisor
and the AVP for HR." Further, Section 2.3 (b) states "The AVP for HR
shall, when reviewing and acting upon a request for an accommodation:
Consult with the employee to determine the job-related limitations that result
from the disability and how those limitations that result from the disability
and how those limitations could be overcome by a reasonable
accommodation." [20]

Defendant has arrogantly never expressed, negotiated, argued nor proven
anything. It has been mute and unresponsive as to any alternatives not
involving full vaccination including but not limited to the possibility of in-
person instruction without vaccination subject to regular testing or
permitting teaching of graduate courses which are customarily remote. Any
of these possible alternatives could not be interpreted as causing undue
hardship to the Defendant.

73. The justified or not, denial of Plaintiff's claim under the ADA for remote
delivery does not justify mandatory vaccination as a condition of continued

[20]   https://www.shu.edu/policies/employees-with-disabilities.cfm

employment.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## COUNT THREE
## VIOLATION OF EQUAL PROTECTION GUARANTEED BY THE FOURTEENTH AMENDMENT AND ARTICLE I OF THE CONSTITUTION OF THE STATE OF NEW JERSEY, DISCRIMINATION AND FAILURE TO ACCOMMODATE ON THE BASIS OF RELIGION AND DISABILITY

74. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

75. The Fourteenth Amendment to the United States Constitution states that no State shall deprive any person within its jurisdiction the equal protection of the laws.

76. Similarly, the New Jersey Supreme Court has interpreted Article 1, Paragraph 1 of the Constitution of the State of New Jersey to include a

guarantee that no person shall be denied the equal protection of the law.

77. Seton Hall University's Policy and practice of denying faculty who can demonstrate natural immunity for COVID-19 an exemption denies such faculty equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

78. Seton Hall University's Policy and practice banning faculty who invoke their rights to informed consent and to refuse medical treatment from campus denies such faculty equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

79. Seton Hall University is applying the Policy arbitrarily and capriciously. It is denying medical exemptions to faculty who have submitted medical contraindications supported by their physicians. It is approving some religious exemption requests and denying others without explaining the criteria and process used to do so other then by reference to statements made by the Archdiocese of Newark that controls Seton Hall University.

80. Seton Hall University's Policy and practice banning faculty who invoke

their right to a medical exemption from the campus and in the past requiring them to wear a mask on campus denies such faculty the equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

81. Seton Hall University's Policy and practice banning faculty who invoke their right to a religious exemption from the campus and in the past requiring them to wear a mask on campus denies them the equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

82. Since Defendants' Policy, practice, actions and omissions, under color of state law, result in Plaintiff being singled out for discriminatory treatment in a manner that is not properly related to any legitimate governmental objective, Defendants deprive Plaintiff of equal treatment and equal protection of the laws in violation of the Fourteenth Amendment and Article I of the Constitution of the State of New Jersey.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal

injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

**COUNT FOUR**
**VIOLATION OF 42 U.S.C. § 1983**
**DENIAL OF MEDICAL FREEDOM**

83. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

84. Defendants in their official capacities have violated 42 U.S.C. § 1983 in that they have, acting under color of law, intentionally deprived Plaintiff of his right to medical freedom, namely his right to informed consent and his right to not submit to medical treatment in violation of the Due Process Clause of the Fourteenth Amendment to United States Constitution.

85. Defendants in their official capacities have violated 42 U.S.C. § 1983 in that they have, acting under color of law, intentionally treated Plaintiff differently from others similarly situated, with no compelling state interest, important governmental objective, or rational basis for the difference in treatment, in violation of Plaintiff's' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

86. Plaintiff has suffered damages as a result of Defendants' violation of his civil rights and seeks compensation pursuant to 42 U.S.C. § 1983.

87. In *Jacobson v. Massachusetts* [21] in what many had considered the seminal case in regard to mandatory vaccination during a pandemic through legislative action before 2020, the city of Cambridge, Massachusetts fined residents who refused to receive smallpox injections. Pastor Henning Jacobson, suggesting that he and his son both were injured by previous vaccines, refused to be vaccinated and to pay the fine. Jacobson had argued that the Massachusetts law requiring mandatory vaccination was a violation of due process under the 14th Amendment particularly the right to live and work where he will. The Supreme Court rejected Jacobson's arguments. Justice John Marshall Harlan wrote about the police power of states to regulate for the protection of public health: "The good and welfare of the Commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts,"

Harlan said "upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Harlan wrote that while the Court had protected such liberty, a citizen:

[21] 197 U.S. 11 (1905)

[M]ay be compelled, by force if need be, against his will and without regard

to his personal wishes or his pecuniary interests, or even his religious

or political convictions, to take his place in the ranks of the army of his

country and risk the chance of being shot down in its defense. It is

not, therefore, true that the power of the public to guard itself against

imminent danger depends in every case involving the control of one's

body upon his willingness to submit to reasonable regulations established by

the constituted authorities, under the sanction of the State, for the purpose

of protecting the public collectively against such danger."

However, the Court did not extend the rule beyond the facts of the case

 before it. Harlan ended his opinion by stating the limitations of the ruling:

"We are not inclined to hold that the statute establishes the absolute rule that

 an adult must be vaccinated if it be apparent or can be shown with

 reasonable certainty that he is not at the time a fit subject of vaccination or

 that vaccination, by reason of his then condition, would seriously impair

 his health or probably cause his death."

88. *Jacobson* stated that the Court did not establish an absolute rule that an

    adult must be vaccinated if it is shown with reasonable certainty that the

    vaccination could seriously impair his health. The mandating of a smallpox

    vaccine injection with a threat of a fine is not equivalent to a mandatory

injection with an mRNA vaccine. A distinction must be drawn between the

mandating of a smallpox vaccine and a dangerous mRNA vaccine. Plaintiff

does not seek to overturn *Jacobson* but to limit its application in regard to

vaccinations as well as to apply its stated exception. There are severe

adverse events (SAEs) reported to be followed by COVID-19 vaccination, [22]

including thrombosis and thrombocytopenia, myocarditis or pericarditis,

inflammatory myositis, autoimmune diseases such as Guillain-Barré

syndrome, and life-threatening allergic reactions known as anaphylaxis.

89. In *Roman Catholic Diocese of Brooklyn, New York v. Andrew M. Cuomo*[23]*,*

The United States Supreme Court ruled against broadly applying the logic of

*Jacobson* to COVID-19 lockdown restrictions. "*Jacobson* hardly supports

cutting the Constitution loose during a pandemic."  wrote Justice Neil

Gorsuch for a 5-4 majority.  Further he wrote to the extent *Jacobson* has any

vitality, the precedent only affects cases that involve unenumerated

substantive due process rights. *Jacobson* should have no bearing,

whatsoever, on laws that restrict "textually explicit rights" in the Bill of

Rights, such as the "right to religious exercise."

[22] See Wei-Yu Chi, Yen-Der Li,, et al., COVID-19 vaccine update: vaccine
effectiveness, SARS-CoV-2 variants, boosters, adverse effects, and immune
correlates of protection, Journal of Biomedical Science, (October 15, 2022)
available on pages 182, 183 at
https://jbiomedsci.biomedcentral.com/articles/10.1186/s12929-022-00853-8#Abs1
[23] 41 S. Ct. 63 (2020)

90. On February 15, 2023, two Idaho lawmakers introduced legislation to criminalize giving out COVID-19 vaccines. State Senator Tammy Nichols and State Representative Judy Boyle introduced House Bill 154 which would make it possible to charge those who administer mRNA vaccines, such as the Pfizer and Moderna vaccines, in the State of Idaho with a misdemeanor. State Senator Tammy Nichols in discussing the bill before the House Health and Welfare Committee stated:

"Notwithstanding any other provision of law, a person may not provide or administer a vaccine developed using messenger ribonucleic acid technology for use in an individual or any other mammal in this state," the bill states. "A person who violates this section is guilty of a misdemeanor."

"We are seeing more and more concerns rising because of the mRNA vaccine," Nichols told the committee. "We have issues that this was fast-tracked, there's no liability, there's no access to data, risk-benefit analysis has not been done, there's no informed consent."

"There are other options available if people want to get a shot that works with COVID," she added. "So, I think there's a lot of discussion that needs to be done on this, I think there's a lot of information that continues to come out with concerns of blood clots and heart issues, and the correlation versus causation needs to be addressed."

In pushing the bill, Nichols said the state makes determinations about drugs that may not be healthy for residents of Idaho and suggested it should approach the vaccine in a "similar manner." [24]

91. Under the Due Process Clause and the Supreme Court's decision in *Jacobson v. Massachusetts,* the right to informed consent and to refuse unwanted medical treatment cannot be circumscribed without legislative action that weighs the safety, efficacy, necessity, reasonableness, proportionality, and discriminatory nature of a particular vaccine mandate and permits an exemption to persons who can demonstrate that they possess a particular medical condition that makes them susceptible to harm, injury or death by the mandated vaccine.

92. COVID-19 vaccines have reportedly killed and injured more people than all other federally recommended vaccines tracked in the national Vaccine Adverse Event Reporting System since its inception.[25]

Since 1986, vaccine manufacturers and healthcare providers have escaped liability for virtually all vaccine related injuries and deaths. We also know

---

[24] https://www.foxnews.com/politics/two-idaho-lawmakers-introduce-legislation-criminalize-giving-out-mrna-vaccines

[25] *See* Vaccine Adverse Event Reporting System at https://openvaers.com/covid-data.  As of May 19, 2023, 35,302 deaths, 201,115 hospitalizations, and 150,837 urgent cares have been reported.

more than ever about preventing and treating disease and about enhancing

immunity without vaccination. Vaccines pose serious risks, including death.

Their benefits are not proven to outweigh those risks, even now, during this

pandemic. Moreover, during a pandemic, vaccines may actually contribute

to viral mutation since there is now growing scientific evidence that the

worldwide vaccination program may be exerting pressure on the COVID-19

virus and variants to mutate, much like the widespread use of antibiotics has

produced deadlier, more virulent, antibiotic resistant bacterial strains.

Additionally, unjustified fear and insatiable greed drive the vaccine industry,

especially now, during this pandemic, because of the opportunity the

pandemic creates for manufacturers to bring to market expensive, novel and

patentable drugs, vaccines, biologics, treatments, and medical devices that

will reap huge profits. Manufacturers are especially driven to bring risky

injury their products may cause under the PREP Act permitting emergency

use. 42 U.S.C. § 247d-6d.

93. Data from the U.S. (in Massachusetts)[26] and abroad (for example, Israel and

---

[26] *See* Catherine M. Brown, DVM; Johanna Vostok, MPH; Hillary Johnson, MHS *et al., Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts*, CDC Morbidity and Mortality Weekly Report MMWR (July 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#suggestedcitation .

the  United Kingdom)[27] suggest that these vaccines are failing to provide

protection against COVID-19, that vaccinated and unvaccinated people

are equally likely to carry and spread the virus, and that viral variants, such

as the Delta variant, appear to be infecting vaccinated and unvaccinated

individuals in roughly equal numbers. Moreover, the effectiveness of

COVID- 19 vaccines has been vastly overstated to the public with

misleading figures which do not account for differences between relative

risk and absolute risk reduction for different members of the population.[28]

Meanwhile, the possibility of antibody dependent enhancement – the

likelihood that COVID-19 vaccine mediated antibodies could actually make

a person more susceptible to infection or exacerbate their disease – has not

---

[27] *See* Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against Delta strain*, The Times of Israel (July 22, 2021) available at https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines- potency-against-delta-strain/; Ian Sample, *Scientists back Covid boosters as study finds post-jab falls in antibodies*, The Guardian (July 22, 2021) https://www.theguardian.com/world/2021/jul/22/uk-scientists-back-covid- boosters-as-study-finds-post-jab-falls-in-antibodies

[27] *See* Les Irwig; Judy Irwig, et al., *Relative and Absolute Risks*, Smart Health Choices: Making Sense of Health Advice (2008) available at *https://www.ncbi.nlm.nih.gov/books/NBK63647/* ("Absolute risk reduction (ARR) – also called risk difference (RD) – is the most useful way of presenting research results. . . ").

been adequately acknowledged or studied.[29]

94. On May 1, 2021, the CDC changed its method for monitoring reported vaccine "breakthrough" cases, choosing to count only breakthrough cases that resulted in hospitalizations or death, thereby reducing the number of breakthrough cases counted for purposes of gauging the actual effectiveness of COVID-19 vaccines and concealing the true vaccine failure rate from the public.[30]

95. Data from Israel and the United Kingdom [31] suggest that COVID-19 vaccine-induced immunity is waning rapidly in those countries.

96. Additionally, there is now strong evidence that persons who have been infected with SARS-CoV-2 and recovered from COVID-19 are protected from future reinfection for over a year, and potentially have lifelong

---

[29] *See* Wen Shi Lee; Adam K. Wheatley; Stephen J. Kent; Brandon J. DeKosky, *Antibody dependent enhancement and SARS-CoV-2 vaccines and therapies,* Nature Microbiology 5, 1185-1191 (2020) available at https://www.nature.com/articles/s41564-020-00789-5?fbclid=IwAR0MTDI0qIQgLkqnjaYI7vyr-H4Wj2IcNiAQT1hWboXDk0YlIdwaCVgr5xg .
https://www.theguardian.com/world/2021/jul/22/uk-scientists-back-covid- boosters-as-study-finds-post-jab-falls-in-antibodies

[30] *See* Centers for Disease Control, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, available at https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

[31] Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against Delta strain*, The Times of Israel (July 22, 2021) available at https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines-potency-against-delta-strain/; Ian Sample, *Scientists back Covid boosters as study finds post-jab falls in antibodies*, The Guardian (July 22, 2021)

immunity – unlike vaccinated persons for whom boosters are already being marketed.[32]

97.  Medical professionals have raised concerns [33] that vaccinating those recently infected can lead to serious injury or death by causing antigen-specific tissue inflammation in any tissues harboring viral antigens.

98. All persons have the right to exercise informed consent and to refuse unwanted medical treatment voluntarily, and free from coercion by government or otherwise. [34]

99. Ivermectin has been used over-the-counter for COVID in many countries and regions with excellent reported treatment success. The drug's safety has been established with at least a billion doses used, and the drug is

---

[32] *See* Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 . *See also* Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans,* Nature 595 (pp. 421-425) (May 24, 2021)

[33] *See* Hooman Noorchashm, MD, *An Urgent Warning to Rutgers University: On a Potential Safety Hazard and Liability in Your COVID-19 Vaccine Mandate* (March 25, 2021) available at https://noorchashm.medium.com/an-urgent-warning-to-rutgers-university-on-a-potential-safety-liability-in-your-covid-19-vaccine-82e10e1e1fb .

[34] *See* Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals (NCT04368728) available at https://clinicaltrials.gov/ct2/show/study/NCT04368728

on the World Health Organization's list of essential drugs.

100.  Defendant has not taken any of these matters into consideration in mandating its Policy.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment  interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## COUNT FIVE
## VIOLATION OF NEW JERSEY CIVIL RIGHTS ACT
### New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c)

101. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

102. The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) provides, in pertinent part, a private cause of action for violations of civil rights as follows:
Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or

laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive relief or other appropriate relief.

103. Defendants, acting under color of state law, deprived Plaintiff of his substantive rights to Due Process (to informed consent, to refuse unwanted medical treatment, to invoke a medical exemption to immunization and to invoke a religious exemption to immunization (guaranteed by state laws, *e.g.* N.J.S.A. 18A:61D-10 *et seq.*), to Equal Protection, to present evidence of immunity in lieu of a vaccination record (guaranteed by N.J.S.A. 18A:61D-1), by mandating the Policy and by applying it arbitrarily and capriciously, by threats, intimidation and coercion, causing Plaintiff damages, in violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax

consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## COUNT SIX
### Estoppel or Detrimental Reliance

104. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

105. Estoppel is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law that prohibits a party from repudiating a previously taken position when another party has relied on that position to his detriment.

106. Generally, its elements are a representation, knowledge that a second person is acting on the basis of that representation, and substantial detrimental reliance by the second person.

107. Plaintiff relied on Seton Hall University's representation in its tenure contract with Seton Hall University to accept employment with the University.

108. When Seton Hall University mandated COVID-19 vaccines, Plaintiff was not in a position to accept alternative equivalent colleges and universities, or to entertain other alternatives to his employment.

109. Plaintiff has suffered damages and will suffer greater damages in the form

of lost time, opportunity, reputation, and income as a result of his reliance on Seton Hall University's representations.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## COUNT SEVEN
### Breach of Contract

110. The Plaintiff repeats, reiterates, and incorporates by reference each and every allegation contained in the previous paragraphs and Counts of this Complaint as if fully set forth herein.

111. Plaintiff and Defendant entered into a binding contract to provide instruction in exchange for fee under agreed upon terms and conditions that did not include a requirement to take a COVID-19 vaccine.

112. Defendant had a duty to abide by those terms and conditions and to not change them without Plaintiff's express authorization.

113. Defendant breached their contract with Plaintiff by adopting unilaterally a

Policy mandating COVID-19 vaccines to teach at Seton Hall University, without any enabling statute or requirement by any health authority.

114. Defendant's breach caused damages to Plaintiff who accepted employment at Seton Hall University and who will be forced to pursue his employment at an alternative college or university.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly, severally and alternatively, for compensatory damages including damages for emotional distress, loss of reputation and other personal injury, back pay, front pay, consequential damages, punitive damages, pre- and post-judgment interest, compensation for negative tax consequences, reasonable attorney's fees enhanced under the LAD, costs of suit, and any other relief this Court deems just.

## PRAYER FOR RELIEF

1. For declaratory judgment, according to statute, 28 U.S.C. § 2201 and 2202;

2. For general damages, according to proof at trial, according to statute, 42 U.S.C. § 1983 and N.J.S.A. 10:6-2(c);

3. For pre-judgment and/or post-judgment interest according to statute, 28 U.S.C. § 1961, N.J.S.A. 56:3-13.16(e);

4. For an award of reasonable attorneys' fees according to statute, 42

U.S.C. §1988 and N.J.S.A. 10:6-2(f);

5.  For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that modifies or bars enforcement of the Policy at issue;

6.  For punitive damages in an amount to be proven at trial;

7.  For costs of suit; and

8.  For such other legal and equitable relief as the Court may deem Plaintiff is entitled to receive.

DATED: June 12, *2023*

REED W. EASTON, P.C
ATTORNEYS AT LAW
By:   *s/Reed W. Easton*
Reed W. Easton, Esq.
34A Route 645
Sandyston, NJ 07826
Tel 908.397-9367
Fax 973.250.0056
reedeaston@earthlink.net
*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(B)**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure hereby demand a trial by jury of all issues in this action so triable as of right by a jury.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

PURSUANT to R.26(a)(1)(A)(iv), demand is hereby made that Defendants disclose to the Plaintiff whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all of part of all of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the Judgment. If so, please attach a copy of each, or in the alternative state, under oath and certification: (a) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all person insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits.

## NOTICE REGARDING NON-DESTRUCTION OF EVIDENCE

Please be advised and noticed that the Defendant(s) should refrain from destroying, deleting, disposing, or altering any potential evidence in its possession which could relate in any way to this matter.

Please be advised and noticed that this includes any and all hard-copy

and electronic evidence. Electronic evidence includes, but is not limited to the hard drives on any and all computers, mobile devices, and/or servers.

To that end:

A. The Defendant(s) should not initiate any procedures which would alter, modify, delete, or overwrite any active, deleted, or fragmented files. Such procedures may include, but are not limited to: saving new files to existing drives; installing new software or operating systems; running data compression and disk defragmentation (optimization) routines; and/or the use of any program which permanently deletes, overwrites, or modifies files or drives.

B. The Defendant(s) should not remove from rotation and/or use any software or electronic hardware, including backup drives and servers, that may contain any relevant electronic information.

C. The Defendant(s) should retain all electronic hardware that would otherwise be destroyed or removed from the possession of Defendant(s) due to failure, upgrade, and/or lease expiration if such hardware may contain any relevant electronic data.


DATED:  June 12, *2023*          REED W. EASTON, P.C
                                 ATTORNEYS AT LAW
                                 By: _ *s/Reed W. Easton*
                                 Reed W. Easton, Esq.

34A Route 645
Sandyston, NJ 07826
Tel 908.397-9367
Fax 973.250.0056
reedeaston@earthlink.net
*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The matter in controversy is not the subject of any other action pending in

any court, or of any pending arbitration or administrative proceeding.

Dated: June 12, 2023.                     REED W. EASTON, P.C
                                          ATTORNEYS AT LAW
                                          By:   *s/Reed W. Easton*
                                          Reed W. Easton, Esq.
                                          34A Route 645
                                          Sandyston, NJ 07826
                                          Tel 908.397-9367
                                          Fax 973.250.0056
                                          reedeaston@earthlink.net
                                          *Attorneys for Plaintiff*

## VERIFICATION FOR COMPLAINT

Pursuant to 28 U.S.C. § 1746, I, DR. REED W. EASTON, of full age certify

as follows:

1. I am the Plaintiff to this action.

2. I have read the foregoing Complaint and all the allegations contained therein.

3. Except as to allegations upon information and belief, which allegations I

believe to be true, I verify that all the allegations in the Complaint are true to

the best of my personal knowledge.

I certify under penalty of perjury that the foregoing is true and correct.


Executed on  June 12,  2023                    _Dr. Reed W. Easton_

                                                      Dr. Reed W. Easton